UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ISABEL GARCIA,                                                    **MEMORANDUM AND**
                                                                 **ORDER**

                           Plaintiff,                            18-CV-306 (RRM)

           - against -

NANCY A. BERRYHILL,

                           Defendant.
-----------------------------------------------------------------X
  ROSLYNN R. MAUSKOPF, Chief United States District Judge.


        Plaintiff Isabel Garcia brings this action against the Commissioner of the Social Security

Administration ("the Commissioner") pursuant to 42 U.S.C. § 405(g).  Garcia appeals the

Commissioner's final decision determining that she was not eligible disability insurance benefits

under Title II of the Social Security Act ("SSA").  Garcia alleges that she is disabled under the

SSA and is thus entitled to receive the aforementioned benefits.

        Before the Court is Garcia's motion for judgment on the pleadings and the

Commissioner's cross-motion for judgment on the pleadings.  (Pl.'s Mot. (Doc. No. 19); Def.'s

Mot. (Doc. No. 21).)  For the reasons set forth below, the Commissioner's motion is DENIED,

Garcia's motion is GRANTED in part and DENIED in part, and the matter is remanded to the

Commissioner for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I.      Garcia's Pre-Application History

Plaintiff Isabel Garcia was born on December 14, 1959, and was 54 years old on the date which she alleges she became disabled.  (Tr. 101.)[1]  She completed the 11th grade and is able to read and write and to communicate in English.  (Tr. 221.)  Beginning in 2000, Garcia worked full- time as a telephone operator at a deli-caterer until she was laid off from the position in 2014.  (Tr. 79, 83–4, 94.)  Garcia applied for and received unemployment benefits following her layoff, (Tr. 94-95), but claims that on account of pain, especially in her knee, she was unable to continue working after this time.  (Tr. 84.)

### II.     Garcia's Application for Disability Benefits

Garcia filed claims for disability insurance benefits under Title II of the SSA on May 15, 2014, alleging an onset of disability of April 1, 2014.  (Tr. 190–94, 221.)  Garcia's claim was denied and she requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 100–08, 113–14, 115–26.)  Garcia appeared for hearing before ALJ Jacqueline Haber Lamkay on July 14, 2016.  (Tr. 69–99.)  ALJ Lamkay denied the claim in a decision dated September 30, 2018.  (Tr. 50–68.)  The Appeals Council denied review of the case on November 21, 2017.  (Tr. 1–7.)

### III.    Opinion Evidence

Because the Court remands on the issue of the weight of the medical evidence regarding Garcia's lumbar spine degenerative disc disease, osteoarthritis and degenerative joint disease-

---

[1] Numbers preceded by "Tr." refer to pages in the Administrative Transcript (Doc. No. 26).

status post bilateral-knee surgeries, the Court will address only the medical evidence and testimony relevant to that portion of the claim and decision.

From the date of alleged onset through the date of the denial of disability benefits, Garcia was treated or examined by two orthopedic specialists and a rheumatologist, as well as receiving treatment from a rehabilitation and physical therapy clinic. She was also examined by a consultative examiner at the request of the SSA.

The findings and observations of these medical professionals are summarized below.

### a. Treating Sources

### 1. Paul Ackerman, M.D.

Dr. Ackerman, an orthopedic specialist, examined Garcia on January 5, 2011, and noted joint tenderness, pain in the left knee accompanied by fluid, and reduced range of motion to 120 degrees. (Tr. 317.) On February 23, 2011, Dr. Ackerman noted that an X-Ray of the right knee showed moderate medical compartment arthritis with spurring. (Tr. 318.) On April 27, 2011, Dr. Ackerman administered an injection of Supartz for pain, administered a second dose on May 4, 2011, and a third and final dose on May 11, 2011. (Tr. 319, 321, 322.) Notes from her June 29, 2011, examination indicate that Garcia continued to have pain in her knee. (Tr. 323.) Dr. Ackerman concluded that a knee replacement might be necessary. (*Id*.) On October 19, 2011, Dr. Ackerman stated that Garcia should undergo additional injections. (Tr. 325.) Dr. Ackerman wrote a narrative on February 3, 2012, in which he noted again that that on physical examination he found joint tenderness, pain in the left knee accompanied by fluid, and reduced range of motion, this time to 110 degrees. (Tr. 316.) He noted that Garcia walked with a limp. (*Id*.) Dr. Ackerman noted a grating sensation in the knee and assessed advanced medial compartment arthritis in the left knee. (*Id*.) Dr. Ackerman referred Garcia to a rheumatologist to consult on

alternatives to knee replacement and noted that he would see Garcia for knee replacement if she opted to have one performed.  (*Id*.)

### 2.    Ezra Sharon, M.D.

Dr. Sharon, a rheumatologist, began treating Garcia on March 3, 2012.  (Tr. 503.)  Dr. Sharon ordered an MRI of Garcia's left knee, which was performed at Queens Medical Imaging on September 15, 2012.  (Tr. 504.)  The MRI showed moderate osteoarthritic changes in the joint space, as well as moderate fluid buildup.  (*Id*.)  The MRI also showed signs of degeneration and tearing within the knee as well as degeneration in the knee ligaments.  (*Id*.)  On October 13, 2012, Dr. Sharon noted that Garcia reported severe back pain and Dr. Sharon personally observed marked limitations of flexion of the low back.  (Tr. 496.)  Dr. Sharon ordered nerve conduction studies which were performed on December 15, 2012.  (Tr. 521.)  These studies revealed spinal nerve damage.  (*Id*.)

On May 13, 2014, Dr. Sharon wrote a narrative letter which stated that Garcia was under his care for osteoarthritis of multiple joints.  (Tr. 315–16.)  The letter noted that Dr. Sharon last saw Garcia on May 17, 2014, and stated that Garcia had chronic pain, swelling, and limited motion in her knees, with difficulty lifting objects and going up and down stairs and walking long distances.  (*Id*.)  The letter also stated that Garcia had morning stiffness for 30 minutes and received physical therapy, medication, and Depomederol injections.  (*Id*.)  On July 12, 2014, Dr. Sharon dictated a telephone message to Disability Determination Services.  (Tr. 326–27, 331–32.)  Dr. Sharon stated that he had treated Garcia since March 2012 for problems with her knees, particularly the left side, that examination revealed deformity of the left knee, that an X-Ray of the knee showed early narrowing of the joint space, and that an MRI of the left knee showed moderate osteoarthritis involving the middle joint space.  (*Id*.)  Dr. Sharon concluded that Garcia

suffered from osteoarthritis of both knees and was moderately limited because of her condition. (Tr. 327.)

In an undated Medical Source Statement, Dr. Sharon stated that he had treated Garcia since 2012 for osteoarthritis of her knees and that her symptoms included pain in both knees, the lower back, and mid-back, and headaches.  (Tr. 442.)  Dr. Sharon gave Garcia a poor prognosis and opined that Garcia could lift less than 10 pounds occasionally but could never lift 10 pounds or more.  (*Id*.)  He opined that Garcia could never push or pull with her upper or lower extremities and could rarely reach, handle, finger and feel.  (*Id*.)  Dr. Sharon stated that Garcia would be in pain constantly, would need to avoid temperature extremes, dust, vibration, humidity and wetness, hazards, and fumes.  (Tr. 443.)  Dr. Sharon opined that Garcia would be absent from work four or more days per month and stated that Garcia was "in severe pain constantly." (*Id*.)  Dr. Sharon concluded that Garcia would be unable to work due to "severe and constant pain." (*Id*.)

Dr. Sharon completed an additional Medical Source Statement dated May 11, 2016.  (Tr. 524–25.)  Dr. Sharon opined that Garcia could sit for two to four hours total in an eight-hour work day, could stand for three hours total in an eight-hour work day, and would need to alternate between sitting and standing every 20 minutes.  (Tr. 524.)  Dr. Sharon opined further that Garcia could lift up to 20 pounds occasionally but never 25 pounds, could occasionally push or pull with the upper extremities but rarely push or pull with the lower extremities, and could occasionally reach.  (Tr. 524.)  Dr. Sharon noted that Garcia's pain would occasionally interfere with concentration, Garcia would need walking breaks and to elevate her leg, and Garcia would be absent two days per month.  (Tr. 525.)  Dr. Sharon noted that Garcia  "will need surgery." (*Id*.)

5

### 3.    Mehran Manouel, M.D.

On September 22, 2014, Mehran Manouel, M.D. examined Garcia at Able Orthopedics and Sports Medicine.  Garcia complained that she had suffered from bilateral knee pain for 6 years and had received repeated courses of Visco Supplementation Injections.  (Tr. 401.)  Dr. Manouel noted that there was pain on palpation and pain on flexion in both knees.  (*Id*.)  Dr. Manouel noted that X-rays performed that day showed severe degenerative joint disease with collapse of the medial joint line more advanced in the left knee.  (*Id*.)  Dr. Manouel administered Depomedrol injections to both knees and prescribed Volatren gel topically and recommended physical therapy.  (Tr. 402.)

On September 29, 2014, Dr. Manouel noted that Garcia had lower back pain.  (Tr. 403.)  Dr. Manouel noted tenderness over the musculature of the right midline and restricted range of motion of the lumbar spine.  (*Id*.)  X-Rays indicated mild degenerative changes with decreased spinal disc height.  (*Id*.)  On October 20, 2014, Dr. Manouel saw Garcia again and she complained of lower back pain with numbness traveling down her left leg.  (Tr. 405.)  Dr. Manouel noted that an MRI showed disc herniation at multiple levels with nerve compression and facet hypertrophy.  (*Id*.)  In January of 2015, Dr. Manouel saw Garcia for a follow-up appointment and recommended that she undergo Supartz injections for pain in both knees.  (Tr. 406.)  On February 23, 2015, Garcia presented after falling on her knees in the snow and ice.  (Tr. 407.)  Dr. Manouel noted severe bruising and swelling in Garcia's knees.  (*Id*.)  Similar findings were noted in March of 2015.  (Tr. 408.)  In June and August of 2015, it was noted that Garcia continued to have pain despite physical therapy and cortisone injections, and approval to administer Supartz injections was submitted to Garcia's insurer.  (Tr. 409–10.)

### 4.    TLC Rehabilitation Physical Therapy

Garcia went to TLC Rehabilitation in October of 2014 for left knee pain and difficulty walking and climbing stairs.  (Tr. 433.)  The records from her appointment note her palpable pain at her left knee as well as reduced function secondary to muscle spasm.  (*Id*.)  Garcia returned in September of 2015 complaining of knee pain.  (Tr. 424.)  She was seen for recurrent worsening knee pain which worsened with walking, climbing stairs, bending and prolonged standing.  (*Id*.)  She was seen on December 9, 2015, when she had an abnormal gait, with pain worsened by prolonged sitting or standing.  (*Id*.)  In March of 2015, progress notes indicate Garcia's decreased function of the lower extremity secondary to muscle spasm, as well as tenderness in the left knee and in the quadriceps.  (Tr. 430.)

Garcia returned on January 25, 2016, complaining of back pain.  (Tr. 415.)  Notes indicate that she was suffering pain at the spinal-pelvic joint as well as slight inflammation in her spine.  (*Id*.)  The notes also indicate that she was unable to bend forward and that she had pain which worsened with prolonged sitting or walking.  (*Id*.)  The physical therapist noted that she had reduced range of motion with flexion, extension, side flexion and rotation as well.  (*Id*.)  The doctor noted that Garcia had decreased strength and decreased function of the low back secondary to muscle spasm.  (Tr. 416.)

### 5.    Dr. Wang, M.D.

Dr. Wang, Garcia's primary care physician, administered multiple physical exams to Garcia from October 2013 until at least May 2016, addressing a variety of general health issues.  (Tr. 333–61, 456–93.)  During this period, Dr. Wang mainly addressed Garcia's smoking habit, hypertension, hyperlipidemia, and obesity.  (Tr. 335–36, 338–44, 346–51, 459, 462, 466–68, 470–74.)  Dr. Wang also ordered mammograms in 2013 and 2014.  (Tr. 352–64.)  Garcia complained of knee pain to Dr. Wang, on June 8, 2015, at which time Dr. Wang gave Garcia a referral for further treatment.  (Tr. 464–65.)  At an

office visit on January 4, 2016, Dr. Wang reported that Garcia "denies joint pain, swelling, muscle weakness, unilateral deficits, or fatigue." (Tr. 460.)

### b.  Non-Treating Sources

### 1.  Chaim Shtock, M.D.

Chaim Shtock, M.D., a physiatrist, examined Garcia on July 31, 2014 at the request of the Commissioner.  He examined Garcia once.  (*See* Tr. 372–74.)  His report notes that Garcia "ambulated with a limping gait" and that she was "unable to squat beyond 40% of maximum." (Tr. 372.)  He noted that she presented with no assistive device, was able to get on and off the examination table and was able to rise from a chair without difficulty.  (*Id*.)  He found that there was no tenderness in the lower spine area, no spasm, and no trigger points, but that flexion in the mid and lower spine was limited to 80 degrees.  (*Id*.)  He further noted swelling and tenderness in the knees.  (*Id*.)  Dr. Shtock noted that he could not assess deep tendon reflexes at the knees[2] and that deep tendon reflexes were 1+ in the ankles.[3]  (*Id*.)  Dr. Shtock opined that Garcia would have mild limitations with frequent bending and with crouching.  (Tr. 374.)  He further opined that Garcia would have moderate limitations for heavy lifting, frequent stair climbing, walking long distances, standing long periods, and sitting for long periods.  (*Id*.)  Finally, he opined that Garcia would have moderate- to-marked limitations with squatting and kneeling.  (*Id*.)

## IV.   The Social Security Administration's Findings

In response to Garcia's initial application for social security disability benefits, the Social Security Administration found that, though Garcia had advanced arthritis of the knees, the

---

[2] Failure to elicit reflex response at the knee is an indication of nerve damage.

[3] A normal DTR is 2+.  A DTR of 1+ is indication of a reflex that is present but slow.

reports did not show that Garcia was therefore unable to perform her work as a phone operator. (Tr. 119.)

## V.   Hearing Testimony

### a.   Plaintiff

Garcia appeared for her hearing before ALJ Jacqueline Haber represented by her counsel, Connor Deverell, of Pond, Lehocky, Stern, Giordano.  (Tr. 72.)  At this hearing, Garcia testified that she could not work anymore because her knees, especially the left knee, were "worn out." (Tr. 84.)  Garcia testified that her last job was taking orders in a deli, where she would answer the phone, take orders, pack the orders into a box, and then bring them for delivery.  (Tr. 79–80.) She stated that she performed her job mostly standing and that she did not lift more than 10 pounds but "sometimes" climbed the stairs.  (Tr. 81.)  Garcia testified that she did not use a switchboard or a headset but "picked up" a hand receiver on a phone.  (Tr. 83.)

Garcia testified that she could stand for 20 minutes and walk for an hour, but that she uses a cane for balance and support.  She could not sit more than 30 minutes without feeling pain in her back.  She could not lift a gallon of milk but could lift a half gallon.[4]  (Tr. 85–86.)  Garcia testified that her sleep is interrupted by pain.  (Tr. 89.)  She stated that she can bathe and can prepare light microwave meals, but that her granddaughter helps her to shop for food because she cannot carry groceries on her own.  (Tr. 89–90.)  Garcia further testified that she is constantly in pain and specifically has constant pain in her left knee, and that in the summer when it is humid she feels pain in both knees.  (Id.)  At times the pain level in her knee is a 10/10 and she also has pain in her wrists at times.  (Tr. 92.)  Garcia testified that she was laid off because the deli closed and that prior to being laid off she was having trouble standing and would frequently take

---

[4] A gallon of milk weighs approximately 8 pounds.

bathroom breaks in order to sit down.  (Tr. 95.)  Garcia testified that she had been diagnosed

with rheumatoid arthritis by a rheumatologist, Ezra Sharon.  (Tr. 74.)

### b.  Vocational Expert Amy Leopold (by written interrogatory)

Vocational Expert Marian Maracco was scheduled to appear to testify at the hearing but

did not appear.  (Tr. 71.)  As a result, ALJ Lamkay issued interrogatories to Vocational Expert

Amy Leopold.  (Tr. 281–85, 292–96.)  In these interrogatories, Ms. Leopold found that Garcia's

past relevant work was as a "telephone operator" (DOT Number 235.662-022).  (Tr. 299.)  Ms.

Leopold stated that the position had transferable skills of "computer skills, interpersonal skills,

and clerical skills."  (Tr. 300.)  Ms. Leopold found that a person of Garcia's age, education, and

work experience could perform the past relevant work of a "telephone operator."  (Tr. 300.)  Ms.

Leopold noted further that Garcia would be able to utilize transferable clerical skills to work at

other office sedentary positions.  (*Id*.)  Ms. Leopold further stated that if the hypothetical

individual was off-task more than 10–12% of the day or absent more than one day per month or

unable to sit for a total of six hours and stand for a total of two hours, there would be no work.

(Tr. 301.)

### c.  ALJ Lamkay's Decision

ALJ Lamkay found that Garcia was not disabled based on the five-part test laid out in 20

C.F.R. §§ 404.1520:

> [1] First, the Commissioner considers whether the claimant is currently engaged
> in substantial gainful activity.  [2] If he is not, the Commissioner next considers
> whether the claimant has a "severe impairment" which significantly limits his
> physical or mental ability to do basic work activities.  [3] If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in Appendix I of the
> regulations.  If the claimant has such an impairment, the Commissioner will
> consider him *per se* disabled.  [4] Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to perform his past work.  [5]

> Finally, if the claimant is unable to perform his past work, the Commissioner then
> determines whether there is other work which the claimant could perform.

*See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134

F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920(a)(4).  ALJ Lamkay

concluded that, though Garcia suffered severe ailments, her condition was not one covered by the

social security regulations, and she had the Residual Functional Capacity ("RFC") to perform her

past job.

First, ALJ Lamkay found that Garcia had not engaged in substantial gainful activity since

the time of her alleged onset date of April 1, 2014. (Tr. 55.)  Second, ALJ Lamkay found that

Garcia was severely impaired by the following ailments: lumbar spine degenerative disc disease,

osteoarthritis, obesity, and degenerative joint disease-status post bilateral knee surgeries.  (*Id.*)

ALJ Lamkay found that Garcia additionally suffered from the non-severe impairments of

hypertension and hyperlipidemia.  (*Id.*)  ALJ Lamkay noted that Garcia alleged that she suffers

from rheumatoid arthritis but stated that there was no reference to that in the record.  (*Id.*)  Third,

ALJ Lamkay found that these impairments did not meet or qualify as the medical equivalent of

any of the listed impairments in Appendix 1 of the regulations.  ALJ Lamkay specifically

considered Listing 1.02 and 1.04A.  (Tr. 56.)

ALJ Lamkay determined that Garcia had the RFC to perform sedentary work as defined

in 20 CFR 404.1567(a) with some exceptions.  She cannot climb ladders, ropes or scaffolds, nor

can she kneel or crawl.  While she can occasionally climb ramps and stairs, she cannot perform

postural activities such as balancing, stooping or crouching.  In addition, she is limited to

engaging in occupations which can be performed while using a cane for ambulation and balance,

and must be afforded the opportunity for brief (1–2 minute) changes of position every half hour.

(*Id.*)

11

ALJ Lamkay acknowledged that Dr. Sharon opined that Garcia has RFC for less than the full range of sedentary work.  However, the ALJ found that "the overall evidence of record, including Dr. Sharon's own treating records," were "not consistent with this opinion."  (Tr. 61.) ALJ Lamkay noted that "[i]n particular, the evidence does not support Dr. Sharon's opinion as regards the claimant's capacity for sitting."  (*Id*.)   ALJ Lamkay also questioned Dr. Sharon's findings as to limitations in her reaching and handling abilities, given that Dr. Sharon was treating Garcia for knee impairments.  (*Id*.)  Additionally, ALJ Lamkay questioned Dr. Sharon's opinion that Garcia's pain would reduce her ability to attend and focus and stated that Garcia was described in physical therapy as being only in moderate pain.  (Tr. 62.)  ALJ Lamkay further observed that the medical records of Garcia's treating primary care doctor, Dr. Wang, indicated that Garcia was not complaining of joint pain, swelling or weakness.  (*Id*.)

At the fourth step, ALJ Lamkay found that Garcia was able to perform past relevant work.  (Tr. 62.)  At the fifth step, ALJ Lamkay found, assuming *arguendo* that Garcia was unable to perform past relevant work, there existed in any case a significant number of jobs in the national economy that Garcia could perform.  (Tr. 63.)  Accordingly, ALJ Lamkay found that Garcia was not disabled for purposes of the SSA and was thus ineligible for benefits.  (Tr. 64.)

Finally, ALJ Lamkay found that the records of Dr. Sharon and Dr. Manouel were not consistent with the level of pain Garcia reported.  (Tr. 62.)  ALJ Lamkay noted that Dr. Shtock's opinion contradicted the opinions of Dr. Sharon and Dr. Manouel in finding moderate limitations for prolonged sitting and standing, walking long distances, and climbing stairs.  (Tr. 62.)

## STANDARD OF REVIEW

In reviewing the final determination of the Commissioner, a court does not determine *de novo* whether the claimant is disabled.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998.)

Rather, the court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g).) "'[S]ubstantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  Where the Commissioner makes a legal error, a "court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).  An ALJ's failure to apply the correct legal standards is grounds for reversal.  *See id.*

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended on other grounds*, 416 F.3d 101 (2d Cir. 2005.)  An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see Butts*, 388 F.3d at 383.

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

13

others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

## DISCUSSION

Garcia appeals the ultimate finding of ALJ Lamkay that Garcia was not disabled, as defined in the Social Security Act, from April 1, 2014, through the date of ALJ Lamkay's decision. Garcia argues that ALJ Lamkay failed to follow the treating physician rule when she subordinated the opinions of treating physician Dr. Sharon to the opinion of the one-time examiner, Dr. Chaim Shtock. (Pl.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings (Doc. No. 20) at 12–16.) Garcia further argues that the consultative opinion directly contradicts Plaintiff's ability to perform sedentary work. (*Id*.) The Court agrees with plaintiff.

## I.   Treating Physician Rule

The "treating physician rule" refers to a series of regulations set forth by the Social Security Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. The Commissioner's "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993). The regulations provide that: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw*, 221 F.3d at 134. "Treating source" is defined as a claimant's "physician, psychologist or other acceptable medical source" who provides, or has provided, the

claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.

The rule of law in the Second Circuit requires the ALJ to "explicitly consider" the factors cited in the regulations and to consider the following in determining whether to override the treating physician's opinion: 1) the frequency, length, nature and extent of treatment; 2) the amount of medical evidence supporting the opinion; 3) the consistency of the opinion with the remaining medical evidence; and 4) whether the physician was a specialist.  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).  An ALJ is required to give "good reasons" for its determination of the weight to accord a treating source's opinion.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam). When controlling weight is not given to a treating physician's opinion because it is inconsistent with other medical evidence or for any other reason, the ALJ must consider the following factors in determining the alternative weight to be given to the treating physician's opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(d)(2)–(6); *see Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134.  Finally, an opinion that is vague as to functional limitations cannot stand as the basis for a finding of RFC.  *See Selian*, 708 F.3d at 421; *Burgess v Astrue*, 537 F.3d at 129.

Here, Dr. Sharon's opinion that Garcia would be unable to work due to severe pain, and that she had an RFC for less than the full range of sedentary work, was owed controlling weight under 20 C.F.R. § 404.1527(d)(2).  Dr. Sharon was a treating physician for purposes of 20 C.F.R.

§ 404.1502, since he had an ongoing treatment relationship with Garcia, and the medical and diagnostic acceptability of his techniques are not disputed.  However, ALJ Lamkay declined to give the opinion of Dr. Sharon controlling weight, on the grounds that the other evidence in the record contradicted Dr. Sharon's findings.  ALJ Lamkay instead assigned significant weight to the opinion of one-time examiner Dr. Chaim Shtock, who found only moderate limitations for prolonged sitting and standing, walking long distances, and climbing stairs.  (Tr. 62.)

Each of the reasons given by ALJ Lamkay for assigning less-than-controlling weight to the opinion of Dr. Sharon fails.  While ALJ Lamkay found that Dr. Sharon's opinion is inconsistent with the records as a whole and with his own treatment records, the Court disagrees.

The physical therapy records note consistently and repeatedly (from October of 2014 through March of 2016) that Garcia was assessed to have a level of pain that was 7 of 10.  (Tr. 415, 430, 433, 436, 445.)  Considering that the scale of 10 indicates a pain so severe that one would seek emergency room treatment, a pain scale of 7 is significant.  Those records corroborate, and certainly do not contradict, Dr. Sharon's opinion that Garcia was suffering from constant pain leaving her unable to work.

ALJ Lamkay found that the medical records of Garcia's treating primary care doctor, Dr. Wang, indicate that Garcia never complained of joint pain, swelling, or weakness.  (Tr. 62.)  For the most part, Dr. Wang does not seem to have addressed the rheumatological issues that were the basis for Dr. Sharon's findings, but was rather monitoring and treating Garcia's ongoing issues of obesity, hypertension and hyperlipidemia.  (Tr. 333–61, 456–93.)  One visit in January, 2016, does show Dr. Wang noting that Garcia did not report any joint pain at that time.  (Tr. 460.)  But Dr. Wang never issued a specific opinion as to Garcia's rheumatological issues.  One visit without a complaint of joint paint does not contradict the opinions of Dr. Sharon and Dr.

Manouel, as Garcia may simply not have been suffering joint pain on that visit. Moreover, the record shows that Garcia did complain of knee pain to Dr. Wang, on June 8, 2015, and Dr. Wang gave Garcia a referral for further treatment. (Tr. at 464–65). The notes of Dr. Wang are therefore consistent with Dr. Sharon's opinion.

ALJ Lamkay's finding that Dr. Manouel's records and Dr. Sharon's own notes are inconsistent with Dr. Sharon's opinions similarly fails. Dr. Manouel found on his first examination of Garcia that she suffered from "severe degenerative joint disease with collapse of the medial joint line." (Tr. 401.) Dr. Manouel prescribed and administered Depomedrol injections to Garcia, which alone indicates severe pain. (*Id*.) Moreover, Dr. Manouel indicated during Garcia's follow up visit that Garcia's MRI results indicated evidence of herniation at the lumbar level with nerve root and thecal sac compression. (Tr. 405.)

Dr. Sharon's treatment notes similarly reflect that Garcia suffered severe pain. Dr. Sharon noted swelling and crepitation, and that Garcia had been taking high doses of ibuprophenol, Mobic, topical Voltaren gel, and Depomedrol injections. (Tr. 495.) In August 2014, Dr. Sharon noted that Garcia was "on her knees" and in "severe pain." (Tr. 497.) He noted that she had swelling and difficulty standing and walking in September 2015. (*Id*.) In March 2016, he similarly noted that Garcia had "severe problems with pain and stiffness." (Tr. 494.) In total, Dr. Sharon's opinion was consistent with the rest of the medical evidence and deserved to be accorded controlling weight.

The Court further finds that Dr. Shtock's opinion by itself was too vague to stand as a basis for finding RFC. First, Dr. Shtock's opinion does not give specific limitations as to Garcia's ability to stand, walk or sit, instead using the vague formulation that Garcia had "moderate limitations." (Tr. 372–374.). This reasoning is too vague as a matter of law.

Moreover, ALJ Lamkay did not provide "good reasons" for giving more weight to Dr. Shtock than to Dr. Sharon with regard to Garcia's RFC. Dr. Shtock's opinion was owed little weight under the factors given in 20 C.F.R. § 404.1527. Though he is a specialist, Dr. Shtock consulted with Garcia only once and for the limited purpose of rendering an opinion in Garcia's social security claim.

Because ALJ Lamkay should have given Dr. Sharon's opinions controlling weight, and because ALJ Lamkay did not provide good reasons for crediting the opinion of Dr. Shtock over that of Dr. Sharon on the issue of RFC, the Court remands the case for further proceedings consistent with this order.

**II .** **The Vocational Expert Testimony**

Because the Court has remanded the case for the reasons set forth above, the Court will only address briefly the issues noted with the vocational expert testimony of Amy Leopold.

The record indicates that subsequent to the hearing and presumably without the benefit of hearing Garcia's testimony with regard to her past work, Ms. Leopold testified via interrogatory that Garcia's past relevant work was as a "telephone operator" (DOT Number 235.662-022). The DOT provides the following description for that job:

> Operates cord or cordless switchboard to relay incoming, outgoing or interoffice calls; Pushes switch keys on cordless switchboard to make connections and relay calls. Plugs cord of cord type equipment into switchboard jacks to make connections and relay calls. May supply information to calls and record messages. May keep record of calls placed and toll charges. May perform clerical duties, such as typing, proofreading and sorting mail. May operate system of bells or buzzers to call individuals in establishment to phone. May receive visitors, obtain name and nature of business and schedule appointments. Exertion sedentary, skill level 3 - semi-skilled.

Based upon the description provided, Ms. Leopold opined that Garcia had transferable skills which could be utilized to work in a sedentary office position. (Tr. 300.) This finding is

inconsistent with the actual testimony, which indicates that the job was not performed in an office setting and was possibly more of a position preparing and selling food in a retail establishment.

Because this Court has remanded the case for the reasons set forth above, the Court cautions that it appears necessary for additional vocational expert testimony to be taken to ascertain Garcia's correct past relevant work and to determine if there exists any transferable skills from that position.

## CONCLUSION

For the reasons herein, defendant's motion for judgment on the pleadings is DENIED, and Garcia's motion for judgment on the pleadings is GRANTED in part and DENIED in part, and the matter is remanded to the Commissioner of Social Security for further proceedings consistent with this opinion.  The Clerk of Court is respectfully directed to enter judgment accordingly, and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      May 28, 2020

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge